**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Richmond Division**

OWEN N. NORTH,

      Plaintiff,

v.                                Civil Action No. 3:11cv211

HAROLD C. CLARKE et al.,

      Defendants.

**<u>MEMORANDUM IN SUPPORT</u>**

      COME NOW the Defendants Harold C. Clarke and John M. Jabe, by counsel, and in support of their motion for summary judgment submit the following.

      Plaintiff Owen N. North ("North"), a Louisiana resident, has filed this action pursuant to 42 U.S.C. § 1983 alleging violation of his constitutional rights under the First and Fourteenth Amendments.   Specifically he alleges that, as a friend of an inmate incarcerated in the Virginia Department of Corrections, he attempted to purchase and give to the inmate a set of compact discs titled "Dylan Thomas: The Caedmon Collection."  North was advised that all compact discs had to be purchased from an inmate's prison account, that he could not order a compact disc and send it to the inmate as a gift.  Furthermore, by policy of the Virginia Department of Corrections, non-music CDs are not permitted to be sold to inmates except those that have religious content (subject to the approval of the Faith Review Committee).  North alleges four causes of action:

First:      the ban on the purchase of non-music compact discs violates the First Amendment;

Second:   the prohibition of secular spoken work CDs while allowing religious CDs constitutes content based discrimination of speech;

Third:    the prohibition of secular spoken work CDs while allowing religious CDs  violates the equal protection clause of the Fourteenth Amendment; and

Fourth:   the ban on gifts of CDs to inmates violates the First Amendment.

He asks for declaratory relief, preliminary and permanent injunctive relief, compensatory damages and punitive damages, attorneys' fees and costs.

The Defendants enclose and incorporate by reference an affidavit from A. David Robinson, Chief of Corrections Operations with the Virginia Department of Corrections ("Robinson Affidavit").  Defendants respectfully request that this Court consider this exhibit as evidence in support of Defendants' motion.

## STATEMENT OF UNDISPUTED FACTS

Defendant Harold C. Clarke is the Director of the Virginia Department of Corrections ("VDOC").  Defendant John Jabe is the former Deputy Director of the VDOC.   Plaintiff North is a Louisiana citizen who wishes to purchase a compact disc collection of poetry entitled "The Caedmon Collection."  On such collection, Dylan Thomas reads his own poetry and poetry written by other authors.  Plaintiff was informed that VDOC does not permit the purchase and possession of secular non-music CDs.

Books, magazines and periodicals are permitted to be purchased and possessed by offenders pursuant to Operating Procedure ("OP") 803.2 attached hereto ("Revised Operating Procedure 803.2").  VDOC provides libraries with many books, magazines and periodicals at each of its facilities.  The written materials are purchased and supplied by

VDOC or through outside donations (that have been screened in accordance with policy). Robinson Affidavit ¶ 6.

Technology has considerably changed and shaped the influx of information into the prisons. When recorded music was only available through radio broadcasts and vinyl records, prisoners were only permitted radios. See Robinson Deposition 29:25- 30:16 (Robinson Deposition, November 7, 2011, pertinent portions attached hereto and hereinafter referred to as "Robinson Deposition"). Unfortunately, there are places in Virginia where prisoners cannot receive good radio signals. Cei Deposition 93:5-7 (Cei Deposition, October 11, 2011, pertinent portions attached hereto and hereinafter referred to as "Cei Deposition"). When cassette tapes became popular, the technology had developed such that the players and the tape could be examined by security sufficiently to allay VDOC concerns and the decision was made to permit recorded music into the prisons. Robinson Deposition 28:5-19. VDOC decided to permit prisoners to purchase prerecorded audio cassette tapes from approved legitimate vendors. These tapes were approved or disapproved at each individual prison facility. If the Warden approved the tape for purchase and possession, the tape would be provided to the prisoner who was able to play the tapes on a tape playback device (which specifically did not permit recording capability). Cei Deposition 94:16-24. After CDs gained in popularity and tapes became less available, VDOC discontinued the sale of the tape playback device and permitted the prison vendor to sell compact disc players instead. Cei Deposition 94:21- 25-- 95:1-4.

Prior to the appointment of the Music Management Committee, VDOC permitted inmates to order music from reputable vendors and the decision to allow or disallow such

music was made at the facility level.  Cei Deposition 24:6-24.  At that time, there were

few if any standards and there was little consistency applied to the incoming music.

Robinson Deposition 24:11 - 25:5.    VDOC recognized this inconsistency and made the

decision to "centralize and try to manage the amount of music coming into the facilities."

Robinson Deposition 25:22- 26:2.   The decision was made to shift from the review and

approval of the incoming material at the facility level review and elevate the review to

VDOC headquarters.    Cei Deposition 25:7-10.  At that time the Music Management

Committee was formed and VDOC began to standardize the treatment of incoming

recorded information.  See Cei Deposition Exhibit # 1.  The standards for the approval of

music were to follow OP 803.2 Inmate Publications and the music should not contain

offensive or inappropriate lyrics.  Cei Deposition Exhibit # 1.

Implementing that direction, the Music Management Committee adopted a

procedure for review of music CDs which includes general research of the artist, and

depending on what the research suggested, the auditioning of some or all of the songs on

the CD.   Cei Deposition 25:10-29:5.  To assist their review process, they consider the

Parental Advisory Warning label and generally disapprove of any CD which carries such

label.  They base this on the rationale that the record industry is already policing their

product and if it has excessive profanity, explicit or particularly violent lyrics so as to be

inappropriate for young adults, then it probably would not be conducive to the

rehabilitation of prisoners and therefore generally should be excluded.  Cei Deposition

34:8-16.  Of course the Music Management Committee must also consider what the

general reputation is as to the artistic credibility or value of the music revealed in the

general research conducted.  Cei Deposition 133:14-25--134:1-19; 140:17-25--141:1-22.

4

Where there is ambiguity or a conflict in these factors, it requires the reviewer to listen to the contents of the CD.  Cei Deposition 133:11-17.


On August 11, 2009, Deputy Director Jabe prepared a memorandum stating that non-music CDs would no longer be permitted for purchase or possession by offenders. The memorandum directed that thereafter non-music CDs were no longer to be sold to prisoners and they were thereafter considered to be contraband.  However, to the extent that prisoners already possessed a non-music CD, in the interests of fairness, those were "grandfathered in" and permitted.  The memorandum specifically permitted Department of Correctional Education ("DCE") to continue to possess approved non-music CDs "specific to and necessary for educational subject matters being taught."  Those CDs though could only be used in  DCE classrooms and may not be loaned to prisoners. There was also a narrow exception carved out for religious CDs and DVDs such that approved non-music CDs and DVDs could be possessed by the institutional chaplain and maintained in the religious libraries provided they are used under the direct supervision of the Chaplain or other staff. "  Those items could not be removed from the Chaplain area or checked out by prisoners.  Robinson Affidavit, Enclosure A.

Thereafter, on April 30, 2010, Deputy Director Jabe by memorandum stated that the VDOC would allow religious non-music CDs to be purchased and possessed by offenders under listed conditions.  Robinson Affidavit, Enclosure A.

Effective November 1, 2011, VDOC amended its OP 803.2 to permit third party gifts of publications.  Revised OP 803.2 IV. G. 2.

## **CLAIM ONE**

VDOC's prohibition of the purchase and possession of non-music, non-religious CDs does not violate the First Amendment because such policy is necessary for maintaining the safety and security of the prison, the prisoners therein and the general public.

Prisoners have protected First Amendment interests both in sending and in receiving mail. *Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989); *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987).    Those outside of prison also have a First Amendment interest in corresponding with prison inmates.  *Thornburgh v. Abbott*, *supra*.  Prison officials may, however, impose restrictions on prisoner correspondence if those restrictions are "reasonably related to legitimate penological interests." *Turner v. Safley*, *supra*.  Such legitimate penological interests might include crime deterrence, prisoner rehabilitation, and protecting the safety of prison guards and inmates. *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011).  Prison security is undoubtedly a legitimate penological purpose since it is "central to all other correction goals."  *Pell v. Procunier*, 417 U.S. 817, 823 (1974).

For any information coming into the prison, whether it be in the form of a book or other written publication, a music CD or spoken word recordings, the VDOC has two compelling interests: in making sure that security is maintained and to strive to maintain an environment which is rehabilitative.  Robinson Affidavit ¶ 5.  Some information enters with little ability for the VDOC to monitor, screen or control the content for these interests, such as radio and television broadcasts.  That information though is also not controlled by the inmate and there are federal broadcasting standards which offer some degree of filtering of the most salacious or incendiary broadcasts.  Where information can

be controlled to accomplish the two paramount interests of VDOC, security and rehabilitation, VDOC must attempt to do so.

It is these attempts to control the information onslaught that bring us to the present conflict. This Court can take judicial notice of the wide range of information that is available in book and audio form. There are instructional books on hand to hand combat, picking locks, creating explosives, gambling, manufacturing drugs and alcohol, to name a few categories. Additionally, there are plenty of publications advocating racial divisiveness, claims of racial superiority, anarchy, and exploring sexual deviancy. Robinson Affidavit ¶ 9. While the First Amendment permits this in the free society, the courts have recognized that to the extent that security and rehabilitation are undermined by such publications, the correctional officials can promulgate regulations to prohibit such material from entering the prison.

VDOC has long permitted the written word into the prison. Numerous books, magazines and periodicals are available to the prisoners in libraries at each of the prison facilities. Robinson Affidavit ¶ 6. All of these forms of written word of course have been screened per the Operating Procedure 803.2 and have been found to not violate the standards set forth therein. Prisoners may order written publications from a number of sources and VDOC is able to sufficiently screen both the content and the physical form sufficient to answer both concerns, namely security and rehabilitation. The procedure for reviewing the content is fairly intuitive: visually scanning the title, the back cover, the table of contents, random portions of the text. Robinson Affidavit ¶ 6. Additionally, the physical book is examined to see whether the pages have been hollowed out, content has been altered (e.g. pages substituted), portions stained (possibly with illegal drugs), or the

book spine is being used to conceal a weapon or other contraband. Robinson Affidavit ¶ 6.  VDOC does this routinely and is able to accomplish it successfully on written publications.

Compact discs however present a different set of problems for VDOC.  The difference in format means that the physical search (the examination of the jewel case and liner notes) is somewhat easier but any search required of the content is considerably different and potentially quite burdensome.  Robinson testifies "I'm saying that the look to the check the book is a lot easier to check than the CD coming in, because you can flip through it, randomly look.  Whereas a CD you would have to listen to each and every word.  And it would take less time to check 100 books versus probably 2 or 3 CDs." Robinson Deposition 73:4-10.  When the two types of searches are compared, Cei testifies that he the review of a book is far quicker and easier.  Cei Deposition 27:15-28:10.

Thus far, VDOC has essentially permitted CDs into the institution where there was no practicable alternative. Robinson Affidavit ¶¶ 7, 8. Originally that was determined to be solely music since music is by nature an aural experience.  The closest alternative form for music would be the notes written as sheet music.  Even assuming that one could read sheet music, it strains credibility to claim that sheet music would pose an acceptable alternative form.   Later, VDOC recognized that there were a number of religious sermons that were available in audio form but not transcribed.  Based on the same rationale that there was no practicable alternative, in conjunction with the higher scrutiny imposed by RLUIPA on any decision infringing on religious exercise, the

decision was made to permit religious CDs into the prison (subject to some additional limitations).

If non-music secular CDs are ordered to be permitted into the prison, this would amount to a sea change in the approach that VDOC has taken to managing the information and would necessitate a different approach to the screening of the material. Though some music CDs might push the boundaries of good taste, contain explicit lyrics or glorify sexual and violent acts, these are the exception and not the rule. Robinson Affidavit ¶ 7. Music is, after all, entertainment based and the messages are secondary, ignored and often misunderstood.[1]

By contrast, there is a vast amount of instructional literature that is specifically focused on and intended to provide reliable information on subjects that would include picking locks[2], manufacturing homemade explosives[3], bootlegging liquor[4], hacking computers etc., all of which would clearly be detrimental to the security and rehabilitation of the prisoners. The result is that the broader range of topics creates significantly more risk that harmful material may enter the prison jeopardizing the security and negatively impacting the rehabilitation of the prisoners. Robinson Affidavit ¶ 9. Since the danger to security is the informational content and less so the physical item (whether weapons are hidden in the jewel case etc.), the review of the content becomes

---

[1] The Court can take judicial notice of the many controversies over the meaning or lack thereof of many Beatles songs such as "I Am the Walrus" (referring to the supposed death of Paul McCartney), the backwards masking controversy, and the mistaken messages supposedly heard by Charles Manson from the song Helter Skelter.
[2] http://www.amazon.com/Practical-Lock-Picking-Physical-Penetration/dp/1597496111/ref=pd_rhf_dp_shvl12
[3] http://www.amazon.com/Explosives-Homemade-Bombs-Joseph-Stoffel/dp/0398024243/ref=sr_1_4?s=books&ie=UTF8&qid=1323984499&sr=1-4; http://www.amazon.com/Improvised-Munitions-Pentagon-U-S-Military/dp/0975900900/ref=pd_rhf_se_shvl3
[4] http://www.amazon.com/Alaskan-Bootleggers-Bible-Leon-Kania/dp/0967452406/ref=sr_1_cc_2?s=magazines&ie=UTF8&qid=1323986631&sr=1-2-catcorr

all the more important.  Robinson Affidavit ¶ 9.  With CDs however, it is the review of the content that is more difficult to accomplish without simply listening to the disc. Robinson Deposition 73:4-10.  Internet research and obvious titles can certainly be used to screen out some material but not all publications are going to be so obvious and not all titles are going to be legitimate.  Since the risk of this information coming in to prison is so great, VDOC would be forced to listen to the majority if not the entire work if there is any ambiguity in its message.  Robinson Affidavit ¶ 9.

Furthermore, there is increased risk in simply increasing the volume of the material to be screened.  Robinson Deposition 61:10-22.   The process of approving a given work would double if every book that has already been permitted in is permitted to be received in audio form as well.  While the review might be comparatively abbreviated if the physical book had been approved, it nevertheless would require some staff time, even if it were only to determine that the two publications were the same.  In a prison environment, an increase in volume of material or work, increases the chance of making a mistake.

> And the sheer magnitude of work that staff have to perform to ensure proper security of our facilities, lends itself to the possibility of somebody bogusly--I mean, we've had things come in marked from JEM and they weren't from JEM.  So the sheer magnitude and the amount of work that our property officers do, creates a level of risk because of the possibility of making a mistake.... Robinson Deposition 61:14-22.

In fact VDOC is already exploring ways to reduce the volume of items coming into the prisons: "...the more we can reduce things coming into our facility, the more secure our facilities are."  Robinson Deposition 62:23-24.

Applying the first *Turner* factor to the regulation: clearly the governmental objective underlying the regulation is legitimate and neutral i.e. unrelated to the suppression of expression.   The prohibition of secular spoken word CDs is clearly related to the legitimate penological interest of maintaining security in a prison system that holds over 33, 000 prisoners while at the same time attempting to preserve the efforts at rehabilitating those same prisoners so that when they do reenter society they are prepared to do so with the right emotional tools at their disposal.

The second of the *Turner* factors looks to whether there is an alternative means of exercising the right in question.

Plaintiffs claims that the CD at issue, The Caedmon Collection, presents Dylan Thomas reading his own and other's poetry and that his voice is "unique and adds to the literary value of the works that he reads."  See Complaint ¶ 9.  However, Plaintiff has failed to prove this assertion.  Plaintiff has proffered a letter dated November 16, 2011, purportedly from Debra Nystrom, a professor of English at the University of Virginia.  The letter does not comport with the requirements of an expert report.  The letter does not state that she reviewed the work in question but instead simply opines on questions posed by counsel.  The letter does not disclose what fee she is charging for her opinion or on what in particular she relied on to formulate her opinion.  Accordingly, under the Rules, her letter should be disqualified as an expert report and Plaintiff should not be allowed to rely on the opinion therein.

Notwithstanding that the letter does not qualify as an expert report, the letter actually discredits Plaintiff's own contention that Dylan Thomas reading his poetry and the poetry of others "adds to the literary value of the work."  Professor Nystrom correctly

refers to poetry as in part an auditory experience.  And she correctly states the auditory experience can be created by reading the poem aloud to oneself.   While Dylan Thomas reading Dylan Thomas is by definition unique, it does not necessarily add value to the listener's experience or otherwise make it qualitatively different from the written work. Professor Nystrom specifically does not state that hearing Dylan Thomas read his poetry is artistically better than someone else reading it aloud.  In fact, Professor Nystrom concludes  that "depending on the speaker, there is likely (for the reasons expressed above) to be added value to a listener's experience even if the speaker is **not** the author." November 16, 2011, letter to Fogel (emphasis added).  Defendants agree and submit that Shawn Goode, the intended recipient of this Dylan Thomas poetry, is able to recreate that added value of the auditory experience through the exploration of his own intonation, pause, duration as he reads aloud the written poetry of Dylan Thomas.  Therefore, there is an alternative means to communicate the auditory aspect to the poetry of Dylan Thomas: by reading it aloud.  While it may not be exactly as Dylan Thomas reads, the alternative means clearly satisfies the second *Turner* factor.

The third *Turner* factor, the impact that accommodation of the asserted constitutional right would have on the correctional officers and prisoners.  If the prohibition against non-music secular CDs is struck, the pressure on the security of VDOC would be significant.  The increased risks of the extra volume of material, the increased labor of reviewing CDs for content would be a huge burden on staff and budget.  Robinson Affidavit ¶ ¶ 9, 10.  The change in policy would require considerable resources that the VDOC simply does not have.   Robinson Affidavit ¶ 10.  Furthermore, the CD in question is a CD collection, containing eleven discs.  Cei Deposition Exhibit

#9.  This CD set then also violates the policy that applies to the music and religious CDs of being no more than approximately an hour in length. Robinson Affidavit, Enclosure A (April 30, 2010 Memorandum).

Lastly, this is not an exaggerated response.  There is no easy alternative that accommodates North's right to communicate by causing the prisoner to receive the CD of his choice without changing the entire policy regarding spoken word CDs.  VDOC cannot clearly and legally differentiate between the Dylan Thomas spoken word CD and the rest of the fiction and nonfiction universe of publications.

VDOC's regulation of non-music secular CDs is valid under the *Turner* factors and Claim One should be dismissed.

## CLAIM TWO

The prohibition against secular non-music CDs does not violate the First Amendment by discriminating against speech lacking religious content because of the unique laws applicable to the prison environment.

Taken out of the prison context, the prohibition of the possession of secular spoken word CDs while at the same time permitting the possession of religious content CDs would clearly violate the First Amendment.  However, in the prison context in which VDOC exists, the Religious Land Use and Institutionalized Persons Act ("RLUIPA")  applies to the prisoners' right to exercise their religious beliefs differently than to the rest of the country.[5]

RLUIPA prohibits the government from imposing "a substantial burden on the religious exercise" of an inmate unless the government can demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive

---

[5] Since land use is not pertinent to this case it will not be discussed.

13

means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).

Thus, to prevail, Plaintiff must first prove that his right to freely exercise his religion has

been substantially burdened.  A substantial burden is "one that 'put[s] substantial

pressure on an adherent to modify his behavior and to violate his beliefs' or one that

forces a person to 'choose between following the precepts of her religion and forfeiting

[governmental] benefits, on the one hand, and abandoning one of the precepts of her

religion . . . on the other hand.'"  *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006)

(*quoting Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)

and *Sherbert v. Verner*, 374 U.S. 398 (1963)).  Only then must the Government

demonstrate that the substantial burden on the inmate's religious exercise furthers a

"compelling governmental interest" and does so by "the least restrictive means."  *See* 42

U.S.C. § 2000cc-1(a); *see also Lovelace*, 472 F.3d at 187.  Courts are required to give

"due deference to the experience and expertise of prison and jail administrators in

establishing necessary  regulations and procedures to maintain good order, security and

discipline, consistent with consideration of costs and limited resources."  *See Cutter v.*

*Wilkinson*, 544 U.S. 709, 723 (2005)(citations to congressional record omitted).

        In a suit brought in the Eastern District, Norfolk division, VDOC was sued under

RLUIPA by a prisoner who alleged that it was an important part of his faith to regularly

listen to sermons that were periodically released on CD and that the prohibition of his

purchasing and possession of these CDs substantially burdened the free exercise of his

religion.  In response to this suit, VDOC investigated and upon determining that the

sermons were not regularly transcribed and therefore were not available in written form,

made the decision to formulate a policy to permit prisoners to access these religious CDs through the Chaplain's Library.  Cei Deposition 39:18-25--40:1-5.

This policy recognized the same logic as the policy to permit the possession of music CDs--the unavailability of the alternative form of this communication weighed heavily in favor of permitting the religious CDs into prison.  Additionally, just as with music, the breadth of topics and information within the religious sermons pales in comparison to the breadth of topics and information contained in secular publications. Just as with music, there is some content folded into a religious sermon that may result in the CD being disapproved such as highly vitriolic racial separatist advocacy.  However, as with music, this is the exception and not the rule.  VDOC has found most of the religious sermons and programming to be consistent with security and rehabilitation of the prisoners.

This policy was in part a recognition that if a different sermon was issued weekly and even one inmate chose to sue under RLUIPA it would force both the inmate and VDOC into repetitive litigation in which VDOC's actions (as they pertain to the religious CD) must withstand strict scrutiny.   It was in the hopes of avoiding this repetitive and costly litigation that VDOC  adopted the policy that permitted the possession of religious spoken word CDs.

RLUIPA by its terms protects that which is religious but does not afford the same protected status to the secular.  As the result of RLUIPA's enhanced protection, the religious CDs were permitted but the secular spoken word CDs remained prohibited. However, it is not Defendants' contention that RLUIPA justifies the prohibition of secular spoken word CDs.  Instead the prohibition is based on the difference inherent in

screening content of books as opposed to the content digitized on a disc that can only be accessed by listening.  As discussed above, screening both the content and the physical book is easier and quicker for VDOC than trying to screen a CD.  VDOC, in its consideration of security scanning, feels that a book of questionable content can be visually reviewed quicker and more effectively than an audio book of questionable content can be listened to.  Cei Deposition 28:1-4; Robinson Affidavit ¶ 9.  The Supreme Court has long recognized that deference should be afforded to the determinations of prison administrators when it involves security interests.  *Thornburgh* at 469.

Accordingly, since the prohibition of secular spoken word CDs is based on the security concerns as discussed in Claim One and not the result of discrimination, Claim Two should be dismissed.

### <u>CLAIM THREE</u>

Defendants' refusal to permit North to send the prisoner the CD collection does not violate the Equal Protection Clause for similar reasons.

The Equal Protection clause requires that persons similarly situated be treated alike.  *Plyer v. Doe*, 457 U.S. 202 (1982).  In order to state a claim of equal protection violation, a plaintiff must demonstrate that he has been treated differently from others who are similarly situated and that the unequal treatment was the result of intentional discrimination.  *Morrisson v. Garraghty*, 239 F.3d 648 (4th Cir. 2001).  "Ordinarily, when a state regulation or policy is challenged under the Equal Protection Clause, unless it involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'"  *Veney v. Wyche*, 293 F.3d at 731 (quoting *Heller v.*

*Doe*, 509 U.S. 312, 319-320, 113 S. Ct. 2637, 125 L.Ed. 2d 257 (1993)).  Since this policy effects expressive conduct protected under the First Amendment, the distinction between the permitted religious communication and the prohibited secular communication must be based on a legitimate penological interest.  *Thornburgh, Id.*

As discussed above, the religious CDs were permitted to be possessed by prisoners to avoid repetitive and costly litigation necessary to defend VDOC's actions under the very restrictive standard imposed under RLUIPA.  The content review necessary for those CDs, though somewhat burdensome, is still manageable since the breadth of topics encompassed by religious speakers is still comparatively limited in scope when compared to the scope of the rest of the publishing world with its instructional books on every conceivable subject.

By contrast, the review necessary to screen the content of the rest of the publishing world, would be to listen to the majority of the content.  Unlike speed reading, fast forwarding a compact disc does not permit review for content.  The penological interest at issue with opening the policy to any CD  is the huge burden that this would impose on VDOC to effectuate this content screening so as to maintain the security inside the prison and the continued rehabilitation of the prisoners.

The distinction furthers a legitimate penological interest and Claim Three should be dismissed.

## CLAIM FOUR

As of November 1, 2011, the OP 803.2 was revised to specifically permit the third party purchase of publications.  Since the treatment of CDs follows the OP 803.2,

counsels for both parties have agreed that this effectively renders moot the challenge to the ban on gifts.  See Revised OP 803.2.

## DEFENDANTS SUED IN THEIR OFFICIAL CAPACITIES

To the extent that Plaintiff is attempting to bring a suit under § 1983 against either of the defendants in their official capacity for monetary damages, this is not cognizable in § 1983.  Neither a state nor its officials acting in their official capacities are persons for purposes of  § 1983.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989).  Therefore, to the extent that Plaintiff is suing the defendants in their official capacity, they are immune from suit in this matter.  *Id*.

## QUALIFIED IMMUNITY

To the extent that Plaintiff might be attempting to request damages, both defendants are entitled to the defense of qualified immunity, there being no allegations of conduct which violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  Qualified immunity involves a two step inquiry: whether a constitutional or statutory right would have been violated on the alleged facts; and whether the right was clearly established.  *Saucier v. Katz*, 533 U.S. 194 (2001).   The court has the discretion to proceed directly to the second step of the *Saucier* analysis after assuming without deciding that a constitutional violation occurred.  *Pearson v. Callahan*, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

The plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right.  *Bryant v Muth*, 994 F.2d 1082 (4th Cir. 1993).  However, a defendant

must demonstrate that the right was not clearly established at the time of the incident to receive qualified immunity. *Henry v. Purnell*, 501 F.3d 374 (4th Cir. 2007). "The unlawfulness must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." *Lopez v. Robinson*, 914 F.2d 486, 489 (4th Cir. 1990).

While the First Amendment rights in the free society might be more certainly established, the case law pertaining to the First Amendment and how it applies to particular mailings into inmates is anything but clearly established with regard to spoken word CDs. The Defendants were acting within the established law to maintain the security of the prisons in trying to reduce the risks of dangerous material entering the prisons. The regulation was clearly designed to permit the prisoners to obtain publications in the form of music CDs and religious CDs for which there were no practical alternatives. While the CD in question may be an example of spoken word CDs that can be enriching and positive, Defendants could not justifiably permit the poetry of Dylan Thomas which is available to prisoners in book form without violating their own policy and opening the door to the vast array of other works and published information that poses serious threats to security. The Defendants were certainly acting within the established law and therefore are entitled to qualified immunity to any damages that could be assessed against them individually.

Wherefore, Defendants respectfully request this Court enter summary judgment on their behalf.

Respectfully Submitted,

HAROLD C. CLARKE and
JOHN M. JABE

By: _____/s/_____
      Richard C. Vorhis, SAAG, VSB # 23170
      Attorney for Defendants
      Office of the Attorney General
      Public Safety & Enforcement Division
      900 East Main Street
      Richmond, Virginia 23219
      Phone:  (804) 786-4805
      Fax:  (804) 786-4239
      rvorhis@oag.state.va.us

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of December, 2011, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send a

notification of such filing (NEF) to the following:

Jeffrey E. Fogel, Esquire
Attorney at Law
913 E. Jefferson Street
Charlottesville, VA 22902
jeff.fogel@gmail.com

Steven D. Rosenfield, Esquire
Attorney at Law
913 E. Jefferson Street
Charlottesville, VA 22902
attyrosen@aol.com

And I hereby certify that I have mailed the document by United States Postal Service to the following non-filing user:  N/A

_____/s/_____
Richard C. Vorhis, SAAG, VSB #23170
Attorney for Defendants
Office of the Attorney General
Public Safety & Enforcement Division
900 East Main Street
Richmond, Virginia 23219
Phone:  (804) 786-4805
Fax:  (804) 786-4239
rvorhis@oag.state.va.us
