UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

OWEN N. NORTH,

                                          Plaintiff,

        v.

HAROLD C. CLARKE and
JOHN M. JABE,

                                          Defendants.

Civil Action No. 3:11−CV−211

## MEMORANDUM OPINION

THIS MATTER is before the Court on cross motions for summary judgment. (ECF Nos.

15 & 17). For the reasons stated below, the Court GRANTS Plaintiff's motion, and DENIES

Defendants' motion.

## I.        BACKGROUND

This case is about the constitutionality of a policy promulgated by the Virginia Department

of Corrections ("VDOC") which prohibits inmates from purchasing or possessing secular spoken-

word compact discs ("CDs"). The following facts are undisputed.

Owen North is an individual who resides in Louisiana. North has a friend, Shawn Goode,

who is currently incarcerated in a state prison facility in Burkeville, Virginia. In December 2010,

North decided to send Goode a Christmas gift. This gift is a collection of CDs entitled "Dylan

Thomas: The Caedmon Collection." In the 11-disc collection, Dylan Thomas, a renowned poet and

bard of the twentieth century, reads some of his finest works such as *A Child's Christmas in Wales*.

Dylan Thomas also reads the works of William Shakespeare and W.H. Auden, some of his favorite

authors. Of this reading, the *New York Times* said: "[Dylan Thomas'] . . . voice has added new

dimension to literary history. He will surely be remembered as the first in modern literature to be

1

both a maker and speaker of poetry." N.Y. Times, Album Jacket, Dylan Thomas: The Caedmon Collection, Introduced by Billy Collins (HarperAudio).

North was informed by prison officials that he could not order and send the CD-collection directly to Goode; rather Goode would have to purchase the CD-collection with money in his prison fund account. North complied with this directive and sent Goode the money to purchase the CD-collection. Prison officials did not allow Goode to purchase the CD-collection based on a VDOC policy which prohibits the purchase or possession of CDs with non-music, or non-religious content.

## A.  Challenged Regulation

VDOC Operating Procedure ("OP") 803.2 governs the receipt, ordering, and possession of incoming publications[1] by inmates in all 43 prison facilities in the Commonwealth of Virginia. Under OP 803.2, an inmate who wishes to order a publication must obtain prior approval from the VDOC facility unit head, or designee; pay for it with funds from the inmate's prison fund account; and order it from a variety of legitimate sources such as a publisher, organization, or governmental agency that publishes or distributes publications. (Pl.'s Mem., Fogel Decl. Ex. F; Defs.' Mem. Ex. 2 Operating Procedure No. 803.2, ECF No. 17.) When the publication arrives at the prison facility, it is x-rayed, and sniffed by a drug dog for contraband. A mail room or personal property personnel also conducts a page-by-page review of the publication for contraband, alteration, or other violation of the standards set forth in OP 803.2.[2] The facility unit head then determines whether a publication

---

[1] Under OP 803.2, "publications" refers to "[a]ny written communication such as newspapers, magazines, newsletters or other periodicals, books, brochures, catalogs, or pamphlets that can be subscribed to or ordered from a legitimate mail order source." (Pl.'s Mem., Fogel Decl. Ex. F; Defs.' Mem. Ex. 2.)

[2] Some of these standards include the prohibition of publications that emphasize explicit or graphic descriptions of sexual acts; instructs or provides information regarding escape techniques; manufacture of weapons or explosives; and materials that depict or promote violence, disorder, or insurrections.

is approved or disapproved. The approximate annual operating budget of VDOC is $980 million dollars, (Pl.'s Mem. 5, Fogel Decl. Ex. G, Deposition of A. David Robinson ("Robinson Dep.") 65:21), and the estimated annual cost of screening incoming correspondence at the 43 facilities is $1,148,000. (Pl.'s Mem. 9 n.8.)

If a publication is disapproved at the institutional level, the publication is sent to the Publication Review Committee ("PRC") for an independent determination. The PRC is made up of three members and they meet at least once a month to review disapproved publications from the 43 VDOC facilities. The PRC maintains a list of disapproved publications which the facility unit heads rely on in reaching their own conclusions. The estimated annual cost of managing the PRC is $21,800. (Pl.'s Mem. 9 n.8.)

Prior to 2008, VDOC allowed inmates to order CDs through legitimate sources, the same way publications were ordered. (Defs.' Mem. 4.) Also, the CDs were reviewed by each facility, the same way publications were reviewed at the institutional level. All CDs were potentially admissible if they satisfied the standards set forth in 803.2, irrespective of whether the content was music, spoken-word, or instruction. (*See* Pl.'s Mem. Fogel Decl. Ex. A (letter prohibiting inmate possession of non-music CDs and grandfathering in inmates' current possession of non-music CDs).)

In 2008, in an effort to centralize the management and set some standards for incoming CDs, VDOC entered into an exclusive contract with Jones Express Music ("JEM"). Under this contract, JEM supplies all CDs as ordered by inmates. This exclusive contract attempted to ensure that incoming CDs were not pirated, did not contain contraband, and the content was not tampered with. (Pl.'s Mem. 8.)

Also in 2008, VDOC formed the Music Management Committee ("MMC").[3] The MMC is charged with reviewing all incoming CDs in VDOC's 43 facilities. (Pl.'s Mem. 8 n.7.) The five-member committee meets twice a year to review music CDs. The standards for approving the CDs are the same for publications under OP 803.2; the CDs also cannot contain offensive or inappropriate lyrics. The MMC, however, follows a different process for reviewing CDs than that followed in the review of publications. Under the MMC's reviewing practices, not all CDs are listened to. Rather, if an artist is researched and if the artist is "legitimate, satisfactory, and acceptable, all his works are allowed." (Pl.'s Mem. 9, Fogel Decl. Ex. D, Deposition of Louis B. Cei ("Cei Dep.") 28:20-22; Defs.' Mem. 4.) The research of the artist is sometimes based on a committee member's knowledge, and sometimes based on a brief internet research of the artist's biography, background, and discography. (Pl.'s Mem. 9, Fogel Decl. Ex. D, Cei Dep. 33:9-11.)[4] "If it appeared that the theme of the music was sexual impropriety, or violence, or profanity, it would be probed further and either rejected based on the research or the disc might be listened to in order to make that determination." (Pl.'s Mem. 9.) The MMC also generally disapproves CDs with a "Parental Advisory Warning" label. (Defs.' Mem. 4.) Since this review process for CDs began, the MMC has established an approved list of approximately 15,000 CDs. (Pl.'s Mem. 9, Fogel Decl. Ex. I.) If an inmate wants to purchase a CD not on the approved list, the inmate may submit a request and the

---

[3] North and Defendants refer to this Committee in various instances as the "Music Review Committee" or the "Music Management Committee." For the sake of consistency, the Court refers to it as the "Music Management Committee."

[4] According to Cei, it is "incredibly burdensome" to listen to the entire music CD, and from a "cost/benefit point of view," it is not "feasible to do so." (Pl.'s Mem. Fogel Decl. Ex. D, Cei Dep. 25:19-25, 27:18-20.)

MMC would determine the permissibility of the artist's works. The estimated annual cost of reviewing music CDs is $1,672.[5] (Pl.'s Mem. 9).

In August 2009, Defendant John Jabe, Deputy Director of Operations,[6] released a memorandum prohibiting the purchase and possession of non-music CDs by inmates. (Defs.' Mem. Robinson Aff. ¶ 4.) In April 2010, Jabe released another memorandum modifying the CD policy. Under the modified policy, inmates could possess and purchase religious non-music CDs if pre-approved,[7] obtained from JEM, and not more than an hour in length. Inmates could also purchase or borrow religious spoken-word CDs from the Chaplain. This policy which allows CDs with music or religious content but prohibits secular, non-music CDs (or secular, spoken-word CDs) is the challenged VDOC regulation.

## B. Plaintiff's Claims

In January 2011, after Goode informed Plaintiff North that he could not purchase the CD-collection because of the VDOC policy, North wrote to Defendant Harold Clarke, Director of VDOC, complaining about the policy. North received a letter from Louis B. Cei,[8] who had been asked by Defendant Clarke to respond to the letter. The letter states that the policy was in place because VDOC did not have the resources to listen to each secular, non-music CD, which was

[5] This cost breaks down as follows: $760 (5 committee members x $38 per hour average wage x 2-hour meetings x 2 meetings a year) + $912 (research or listening to CDs, answering mail, phone calls (2 hours per month x 12 months x $38 per hour average wage) = $1,672 per year. (Pl.'s Mem. Fogel Decl. Ex. E, Answer to Interrogatory #10.) This amount is purportedly expended in reviewing each music CD, however, not every music CD is listened to in its entirety.

[6] During the course of this litigation, A. David Robinson succeeded Jabe. Robinson's title, however, is Chief of Operations, as opposed to Deputy Director of Operations. Both positions have the same job functions.

[7] The Faith Review Committee ("FRC") reviews religious publications and CDs and recommends CDs for addition to the preapproved list.

[8] Louis B. Cei is VDOC's Manager of Special Programs, co-chairs the Music Management Committee and the Faith Review Committee, and also previously served on the Publications Review Committee.

necessary because modern technology permits the assertion of prohibited information anywhere on the CD. In addition, the letter indicates the policy was supported on the grounds that "virtually all spoken word CD information can be found in book form." (Pl.'s Mem. 6, North Decl. Ex. B.)

On April 4, 2011, North filed a Complaint against Defendants Clarke and Jabe. In his Complaint, North raises four constitutional claims under the First and Fourteenth Amendments to the United States Constitution[9] and 42 U.S.C. § 1983. Claim One asserts that the VDOC policy violates the First Amendment because it lacks valid penological justifications. Claims Two and Three assert that by allowing religious CDs but prohibiting secular, non-music CDs, the policy violates the First and Fourteenth Amendments. Claim Four states that the ban on the receipt of gifts violates the First Amendment because it lacks penological justifications.[10] North seeks declaratory judgment, injunctive relief, and monetary damages, and attorney's fees and costs.

In August 2011, the Court denied Defendants' motion to dismiss for lack of standing and failure to state a claim. (Mem. Op. Denying Defs.' Mot. Dismiss, Aug. 2, 2011, ECF No. 9.) Both parties have now filed motions for summary judgment. Defendants also assert the defense of qualified immunity.

## II.    LEGAL STANDARD

A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). All "factual

---

[9] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The Fourteenth Amendment states, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

[10] In November 2011, while this action was pending, VDOC modified OP 803.2 to permit third-party purchase and inmate receipt of gift publications. Because CDs follow the procedures in OP 803.2, both parties agree that Claim Four is moot. (*See* Pl.'s Mem. 1 n.1; Defs.' Mem. 17-18.) Consequently, Claim Four is not addressed in this Memorandum Opinion.

disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted).

In making its decision, a court must look to the affidavits or other specific facts pled to determine whether a triable issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1996). Where there is no genuine dispute as to any material fact, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006). Summary judgment should not be granted, however, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 258.

When faced with cross-motions for summary judgment, the standard is the same as that applied to individual motions for summary judgment. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol*, 316 F.3d at 523 (internal quotation marks omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied. 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2720 (3d ed. 2011). However, "if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Id.*

### III.    DISCUSSION

**A.  Claim One: The Prohibition of Secular, Non-Music CDs Lacks Penological Justifications and Violates the First Amendment**

North argues that the VDOC policy prohibiting secular, non-music CDs infringes his First Amendment rights. It is well established that "'prison walls do not form a barrier separating prison inmates from the protections of the Constitution,' nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (citations omitted). However, "these rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 85 (1987)). Courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (citations omitted). In addition, the burden is on the inmate to disprove the validity of the prison regulations. *Id.*

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89 (1987). To determine the reasonableness of a challenged regulation, the following four *Turner* factors are to be considered: (1) the relationship between the prison regulation and the stated governmental interest; (2) the existence of alternative means of exercising the asserted constitutional right; (3) the impact of accommodating the asserted constitutional right on guards, other inmates, and prison resources allocation; and (4) the existence of ready alternatives to the prison regulation. *Id.* at 89-90. These four factors are addressed in turn.

In *Turner*, the Supreme Court specified that under the first factor: "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a

legitimate and neutral one." *Turner*, 482 U.S. at 89-90. In *Thornburgh*, the Court further elaborated that the first factor consists of three sub-factors: (1) legitimacy, (2) neutrality, and (3) rational relationship to the state justification. *Thornburgh*, 490 U.S. at 414. Thus, this Court must inquire into the legitimacy, neutrality, and rationality of the stated governmental justifications to the challenged policy.

For the reasons that follow, the Court finds that the VDOC policy bears no rational relationship to the stated governmental interests. Defendants identified two justifications for the challenged regulation—security and rehabilitation of the inmates. Both of these justifications hinge on the notion that if harmful information enters the prison facilities, it would pose a danger to security and affect the rehabilitation of inmates. The legitimacy of VDOC promulgating regulations that restrict the *total amount* of information which enters the prison facilities is unquestionable. What is suspect, however, is the fact that the regulation as it stands is not neutral.

A prison regulation is "neutral" if it restricts inmates' rights "without regard to the *content* of the expression." *Turner*, 482 U.S. at 90 (emphasis added). Alternatively stated, if the regulation "'furthers an important or substantial governmental interest unrelated to the suppression of expression,'" then the regulation is neutral. *Thornburgh*, 490 U.S. at 415 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1973)). On its face, the VDOC policy distinguishes between music and non-music CDs, secular and religious CDs. Defendants argue that the distinction between music and non-music CDs is drawn because: (1) "[m]usic is an audio experience and there is no reasonable alternative form to music," and (2) the content of non-music CDs is available in written format. (Defs.' Mem. Robinson Aff. ¶ 7, ECF No. 15-1). The permissibility of religious CDs, Defendants argue, is on the grounds that weekly sermons, for example, are not transcribed into written format and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") affords greater protection to inmates' religious exercise rights. (*Id.* ¶ 15.) These distinctions are based primarily on

the content of the expression rather than with an eye toward potential implication for prison security and rehabilitation. If the VDOC policy prohibited all CDs based on some substantial governmental interest, the policy may have satisfied the neutrality standard. *See Thornburgh*, 490 U.S. at 415 (stating that "[t]he ban on *all* correspondence between certain classes of inmates at issue in *Turner* clearly met this 'neutrality' criterion."). As it stands, however, the policy is not neutral and consequently, is unreasonable.

An analysis on the third sub-factor—the rational relationship between the stated objectives and the policy further evinces this point. In a nutshell, Defendants argue that if secular, non-music CDs are permitted, the volume of information that needs to be reviewed would increase, the increase in the amount of information would lead to the possibility of inadvertently permitting harmful information, and moreover, Defendants do not have the resources to allocate to the review of the secular, non-music CDs. Currently, VDOC has an exclusive contract with JEM under which JEM provides the CDs requested by inmates. If secular, non-music CDs are permitted, these CDs can also be ordered through JEM and this militates against Defendants' arguments of possible tampering. Although VDOC has in some instances received CDs as though they came from JEM, but in actuality were not from JEM, prohibiting secular, non-music CDs does not address this concern and is not narrowly tailored to eliminating a potential threat to security or rehabilitation.

As North points out, the policy boils down to the allocation of resources. Defendants are apprehensive that the permission of secular, non-music CDs would lead to a strain on their resources. It is obvious that permitting secular, non-music CDs would increase the amount of resources required to review CDs as a whole, but what is not obvious is how much more. Without evidence of an unreasonable burden, Defendants' hypersensitivity to costs is nothing more than grand speculation—one that does not warrant the unauthorized burdening of constitutional rights. A holding that yields to Defendants' parsimony would essentially eviscerate the premise in *Turner*

which recognizes constitutional rights of inmates, because almost every decision upholding the

constitutional rights of inmates necessitates the use of some amount of resources. *See, e.g., Turner v.*

*Safley*, 482 U.S. 78 (1987) (recognizing inmates' right to marriage); *Procunier v. Martinez*, 416 U.S. 396

(1974) (recognizing inmates' right to correspond without unjustified government interference).

In addition, Defendants claim they are endeavoring to reduce "the volume of items coming

into the prisons." (Defs.' Mem. 10). However, a policy that favors the written format instead of the

audio version of the same work, militates against the goal of reducing the *volume* of items that enter

the facilities. Written works are no doubt more voluminous in comparison to their CD counterparts.

Hence, a better policy might in fact be one which favors the admission of CDs as opposed to the

written equivalent.

Based on all of the above, the Court finds that under the first *Turner* factor the VDOC policy

bears a remote relationship to the governmental interest of security and rehabilitation. This alone

supports the argument that the policy is unreasonable. Nevertheless, the remaining factors are also

considered.

Turning to the second *Turner* factor, the alternative means of exercising the right to

communicate with inmates proffered by Defendants does not demonstrate the validity of the

VDOC policy. Defendants argue that Goode can recreate the auditory experience of hearing Dylan

Thomas' voice by reading Dylan Thomas' poems aloud to himself. Spoken-word is a different form

of art than mere poetry in its written form. In fact, in this specific instance, the record indicates that

Dylan Thomas' "poems are nearly inconceivable without [his] voice." Line Jacket, Dylan Thomas:

The Caedmon Collection, Introduced by Billy Collins. The record also indicates that the individuals

who have heard Dylan Thomas' voice outnumber those who have read him in print. The Supreme

Court has stated that "[t]he absence of any alternative . . . [is] 'some evidence that the regulations

[a]re unreasonable,' but is not 'conclusive' of the reasonableness of the [regulation]." *Beard v. Banks*,

548 U.S. 521, 532 (2006) (quoting *Overton*, 539 U.S. at 135). North intended to communicate with Goode through the voice of Dylan Thomas, and not his words alone. This form of expression cannot be exercised if Goode reads the poem aloud to himself, especially considering the uniqueness of Dylan Thomas' voice. The Court finds that policy is unreasonable in light of the analysis of the second *Turner* factor.

The third *Turner* factor is the impact of accommodating the asserted right on other inmates, guards, and the public. Overall, the impact of permitting secular, non-music CDs on the guards, other inmates, and the public appears to be a positive one. Similar to the discussion of the first factor, it is evident that permitting secular, non-music CDs would decrease the volume of items that come into the prison facilities. Currently, written works are reviewed on a facility-by-facility and on a page-by-page basis; whereas, if their CD counterparts are permitted, admissibility would be determined on a system-wide basis. Furthermore, once an artist or author of a secular, non-music CD is approved, all his works are admitted, as opposed to the publication-by-publication review of written works. If an inmate who is faced with the choice of ordering a CD or the written equivalent opts for the CD, once that CD is reviewed, another inmate, even at another VDOC facility, can obtain that CD without subjecting the work to additional review. More so, in the long-run, accumulating a substantial list of approved CDs would essentially mean that less CDs would have to be subjected to content review. The efficiencies of a system-wide review far outweigh the drudgery of a facility-by-facility review. Thus, in light of the positive impact of accommodating the asserted right, the Court finds that the challenged regulation is unreasonable.

On the final *Turner* factor, the Supreme Court states the following:

> The absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. . . . [I]f an inmate can point to an alternative that fully accommodates the prisoner's rights at the *de minimis* cost to valid penological

> interests, a court may consider that as evidence that the regulation does not satisfy
> the reasonable relationship standard."

*Turner*, 482 U.S. at 90-91 (citation omitted). Essentially, if the asserted right can be accommodated

with minor costs to valid penological interests, then the policy is unreasonable.

The Court finds that VDOC's policy prohibiting secular, non-music CDs is an exaggerated

response to VDOC's security and rehabilitation objectives. There are obvious and easy alternatives

to a complete ban on secular, non-music CDs that accommodate North's right to communicate with

his inmate-friend and impose only a *de minimis* burden on the pursuit of security and rehabilitation.

One alternative which North points to, and which the Court finds legitimate, is a policy that reviews

secular, non-music CDs under the same procedures currently in place for reviewing music or

religious CDs.[11] VDOC already employs a cost/benefit analysis in its method for reviewing music

CDs. *See supra* note 4. It is evident that at the very least, it would take no more than 10 seconds to

disapprove a CD entitled *Hitler's Greatest Speeches*, for instance. If the title is not so flagrant, a few

seconds of listening to a CD would lead to the exclusion of secular, non-music CDs that are indeed

---

[11] The parties disagree on whether secular, non-music CDs, if permitted, would be reviewed the same way music CDs are currently reviewed. The parties base their disagreement of Cei's and Robinson's depositions, and Robinson's affidavit. In Cei's deposition, he was asked: "If you had approved the policy that allowed spoken word compact discs, the likelihood is that you would simply do the same kind of research that you do music compact discs?" (Pl.'s Response 2, Cei Dep. 120:10-15, ECF No. 33-2.) Cei responded in the affirmative. Cei was also asked: "As for listening to the CD, is there a difference, in your experience, between listening to a music CD for content problems . . . versus a non-music CD?" (Pl.'s Response 2, Cei Dep. 137:16-20, ECF No. 33-2.) Cei responded in the negative. In Robinson's affidavit, however, he states if secular, non-music CDs were permitted, "VDOC would be forced to listen to the majority if not the entire work" and it "there would be a huge burden on staff and the budget." (Defs.' Mem. Ex. 1, Robinson Aff. 4.) Cei is the chair of both the Music Management Committee and the Faith Review Committee and he also previously served on the Publication Review Committee. Robinson, however, just replaced Jabe (Deputy Director), *see supra* note 6, and it appears that at the time of his deposition, he was unfamiliar with the reviewing process of the Music Management Committee. (Pl.'s Response 2, Cei Dep. 38-39, ECF No. 33-2.) Also, it is unclear from the record whether Robinson has ever served on the Music Management Committee, the Faith Review Committee, or the Publication Review Committee. Regardless, the Court gives more weight to the deposition testimony of Cei on the basis of his hands-on experience.

harmful to inmates' security and rehabilitation. Only in rare instances would a CD be listened to in its entirety.[12] Hence, imposing a complete ban on secular, non-music CDs is an exaggerated response to VDOC's security and rehabilitation objectives and the Court finds that the policy is unreasonable.

Based on all of the above, the Court concludes that the VDOC policy which prohibits secular, non-music CDs is not reasonably related to legitimate penological interests and violates the First Amendment.

**B. Claims Two and Three: The Prohibition of Secular, Non-Music CDs Violates First and Fourteenth Amendments**

North contends that by allowing religious, non-music CDs but prohibiting secular, non-music CDs, Defendants violate the First Amendment and Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause of the Fourteenth Amendment "prohibits a government actor from treating an individual differently from others with whom he is similarly situated, where the unequal treatment is the result of intentional or purposeful discrimination." (Mem. Op. Denying Mot. Dismiss 6 (citing *Williams v. Hansen*, 326 F.3d 569, 576 (4th Cir. 2003).) First Amendment rights, such as the right to free speech, are fundamental rights guarded by the Equal Protection Clause. *See Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92 (1972). As this Court stated in the denying Defendants' motion to dismiss, "*Mosley* demonstrates that a plaintiff suffers constitutional injury to his right under the Equal Protection Clause when legislation classifies expression according to its content and then prohibits the expression related to a particular classification of content." (Mem. Op. Denying Mot. Dismiss 7.)

A policy regulating the content of speech is subject to strict scrutiny and is valid only if it is "narrowly tailored to promote a compelling [g]overnment interest." *United States v. Playboy*

---

[12] This is premised on the presupposition that the physical integrity of the incoming CDs is uncompromised, because they would be supplied by JEM.

*Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000). If there is a less restrictive alternative to accomplish the government's objectives, that alternative must be chosen. *Id.* "To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *Id.* "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists." *Id.*

"'Content-based regulations are presumptively invalid,' and the [g]overnment bears the burden to rebut that presumption." *Playboy Entertainment Group*, 529 U.S. at 817 (quoting *R. A. V.* v. *St. Paul,* 505 U.S. 377, 382 (1992)).

The VDOC policy in so far as it favors the admissibility of religious, spoken-word CDs to the exclusion of secular, non-music CDs, is premised on content discrimination. Because it discriminates based on content, the VDOC policy is subject to strict scrutiny. Defendants attempt to justify this by asserting that it is more burdensome to review secular, non-music CDs because "the breadth of topics and information within the religious sermons pales in comparison" to that of secular works. (Defs.' Mem. 15.) Defendants also maintain that most religious sermons are "consistent with security and rehabilitation" of inmates. (Defs.' Mem. 15.) Defendants argue that the prohibition of secular, non-music CDs is based on security concerns, as opposed to discrimination, and furthers legitimate penological interests of security and rehabilitation. While the Court may agree that religious, non-music CDs are consistent with the rehabilitation objectives, there are also a vast number of secular, non-music CDs consistent with rehabilitative goals. As stated in the analysis of the *Turner* factors above, the VDOC policy imposing a complete ban on secular, non-music CDs bears no rational relationship to the stated penological interests of security and rehabilitation. Because the VDOC policy does not pass the rational based scrutiny embedded in the *Turner* factors, it further fails to satisfy the higher standard of strict scrutiny.

Defendants also raise similar arguments about RLUIPA which this Court addressed in denying the earlier motion to dismiss. According to Defendants, because RLUIPA subjects to strict scrutiny a government regulation that impinges on the rights of an inmate, RLUIPA "protects that which is religious but does not afford the same protected status to the secular." (Defs.' Mem. 15.) Defendants contend that "[w]ere it not for RLUIPA the religious non-music CDs would not be permitted either." (Defs.' Response 5.) In denying similar arguments in the earlier motion to dismiss, the Court stated:

> RLUIPA does not function in the manner [Defendants] suggest it does. RLUIPA supplies a vehicle for an inmate's free exercise claim and an inmate's defense to a government action. By its terms, the statute does not supply a government's defense to a prisoner's free speech claim. As a practical matter, *the obligation RLUIPA imposes on VDOC may explain why its policy allows the receipt of religious spoken-word compact discs. That explanation, though, does not help justify the prohibition on non-religious spoken-word compact discs.* Therefore, RLUIPA provides no basis for dismissing Count [Two].

(Mem. Op. Denying Mot. Dismiss 9-10 (emphasis added).) Defendants still fail to provide adequate justification for their policy which discriminates based on content by permitting religious spoken-word CDs but prohibiting secular spoken-word CDs. Defendants' reliance on the effects of RLUIPA do not justify the violation of North's free exercise rights.

For these reasons, the Court finds that the VDOC policy which permits religious spoken-word CDs but prohibits secular spoken-word CDs is not supported by adequate justification. Thus, the Court concludes that the VDOC policy violates the First and Fourteenth Amendments.

## C.  Qualified Immunity

In their Motion, Defendants raise the issue of qualified immunity as it relates to the recovery of monetary damages. Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis of the application of

qualified immunity involves a two-step inquiry: (1) whether "the facts alleged show the officer's conduct violated a constitutional right" and (2) if so, "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

It is clear that the policy prohibiting North from communicating with his inmate-friend via a spoken-word CD violates North's First Amendment right of expression. Thus, the relevant inquiry as to whether Defendants are qualifiedly immune is whether the right was clearly established at the time the right was violated.

A right is "clearly established" if "[t]he contours of the right [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009). Essentially, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. (citations omitted).

Qualified immunity is an affirmative defense that must be pled by the defendant-official but "the plaintiff carries the burden of showing that the defendant's alleged conduct violated the law and that such law was clearly established when the alleged violation occurred." *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993).

"Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Rock for Life-UMBC v. Hrabowski*, 411 Fed. Appx. 541, 555 (2010) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In this case, in promulgating the challenged regulations, Defendants took only budgetary constraints into consideration and not necessarily the justifications of security and rehabilitation. In so doing, Defendants infringed on North's right to communicate with Goode. However, it does not appear that Defendants engaged in this course of action in knowing violation of clearly established law. Furthermore, Defendants labored under the mistaken

premise of security and rehabilitation, and "they should [not] be made to pay for this mistake from their own pockets." *Rock for Life-UMBC*, 411 Fed. Appx. at 555. Therefore the Court holds that qualified immunity shields Defendants from liability for monetary damages.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's Motion for Summary Judgment (ECF No. 17), and DENIES Defendants' Motion for Summary Judgment (ECF No. 15). The Court also holds that the defense of qualified immunity bars the recovery of monetary damages from Defendants.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order will issue.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this  7th   day of February 2012.